IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:07cv395

| | |
|---|---|
| BENHAM, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | MEMORANDUM AND ORDER |
| ) | |
| CITY OF CHARLOTTE, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**THIS MATTER** is before the Court on Plaintiffs' Motion for Preliminary Injunction and Declaratory Relief and Memorandum (Doc. Nos. 8, 9), Defendants' Response in Opposition to the Motion (Doc. No. 10), and Plaintiffs' Reply in Support of the Motion (Doc. No. 12). For the reasons stated below, the Court **DENIES** Plaintiffs' Motion for Preliminary Injunction and holds in abeyance its ruling on the Motion for Declaratory Judgment pending further development of the case.[1]

I.  FACTUAL FINDINGS

This case involves the City of Charlotte's denial of a public assembly permit applied for by Rev. Philip Benham on behalf of Operation Save America, a non-profit corporation. In 2004, Charlotte amended portions of its Code dealing with picketing (Chapter 19, Article X) and public assemblies and parades (Chapter 19, Article XI). In doing so, Charlotte recognized its interest to protect the right of individuals to exercise First Amendment rights in traditional public forums,

---

[1] Because a preliminary injunction is not being issued, the Court will **DENY** as moot the plaintiffs' Motion to Waive Posting a Security Bond to Obtain a Preliminary Injunction (Doc. No. 13).

such as public sidewalks, streets, and parks. (Doc. No. 10-5: Response at Affidavit of Brenda Freeze, Exhibit A: Ordinance No. 2621). Charlotte further recognized its interest in "protecting the health, safety, and welfare of the general public and preserving public order" and in "maintaining the free flow of traffic on public streets and sidewalks, preserving access to public places and buildings and protecting property." Id. Charlotte's stated purpose in amending the Code was to further its governmental interests by imposing

> . . . reasonable and constitutional regulations for the use of public streets, sidewalks, and parks during a picket, public assembly, or parade . . . without regard to the purpose or content of the message, but to preserve the public peace and to avoid unreasonable conflicts with other legitimate use of such property.

Id.

As amended, the Code requires a permit for any public assembly. Charlotte City Code, Art. XI, § 19-312(a). A public assembly is defined as

> (1) a festival or demonstration which is reasonably anticipated to obstruct the normal flow of traffic upon any public street and that is collected together in one place; and
> (2) a festival on the Old City Hall lawn, the Charlotte-Mecklenburg Government Center Plaza, or in Marshall Park, Polk Park, Independence Square Plaza, Arequipa Park or any other city-controlled Park.

Charlotte City Code, Art. XI, § 19-311. A festival "means a concert, fair, exhibit, promotion, community event, block party, or similar event." Id. A permit may be denied based on reasons detailed in § 19-312(c). If the permit official denies an application, that decision may be appealed to the appeals official, who must hold a hearing. Charlotte City Code, Art. XI, § 19-312(f). If the denial is upheld, the applicant may appeal to the Superior Court of Mecklenburg County. Id.

The Code does not require a permit for a picket, which is defined as

> . . . a public display or demonstration of sentiment for or against a person or cause, including protesting which may include the distribution of leaflets or handbills, the display of signs and any oral communication or speech, which may involve an effort to persuade or influence, including all expressive and symbolic conduct, whether active or passive.

Charlotte City Code, Art. X, § 19-301. Picketing is allowed on public sidewalks and at city-controlled locations, such as Independence Square Plaza. Charlotte City Code, Art. X, § 19-303. Picketers may not obstruct pedestrian or vehicular traffic and must comply with other city ordinances, such as the noise ordinance. Id.

On December 14, 2006, Sheryl Chandler submitted a public assembly application on behalf of Rev. Benham and Operation Save America. The application described the proposed event's name as "Roe vs Wade Memorial" to be held on January 22, 2007, between 11:30 a.m. and 1 p.m., at "Trade and Tryon–in front of the bronze disc sculpture."[2] (Doc. No. 10-3: Response at Affidavit of Emily Westbrook, Exhibit A: Application). The application stated that the event would not involve the closure of streets, the sale of alcoholic beverages or food, the provision of portable toilets, or the charging of admission and vendor fees. Id. The event was described as "evangelical, gospel proclamation, praise + worship band, local Christian pastors speaking, post-abortive mothers give testimony, call to repentance" with one stage for musical entertainment. Id. Based on previous years' attendance,[3] it was estimated that 100 people would attend. Id.

---

[2] The Court takes judicial notice that January 22, 2007, was a Monday. The area described in the application is known as Independence Square Plaza and sits at the very center of uptown Charlotte.

[3] Although the application implies that the event had been held previously, none of the plaintiffs had applied for a permit before 2006. (Doc. No. 10: Response at Affidavit of Emily Westbrook, ¶ 7).

On December 20, 2006, Permit Official Emily Westbrook notified Rev. Benham by letter that she could not accept and process his application. (Doc. No. 10-3: Response at Affidavit of Emily Westbrook, Exhibit B: Letter). She explained that the event was a demonstration and not a festival according to the City Code and that permits for demonstrations at Independence Square Plaza are not issued.[4] Id. Instead, demonstrations at that location are covered by the picketing ordinance which does not require a permit. Id. Ms. Westbrook informed Rev. Benham that he was required to notify the police department if he expected 50 or more attendees and to obtain an amplified sound permit if he used amplification. Id.

On December 28, 2006, Rev. Benham appealed Ms. Westbrook's decision to Appeals Official Keith Parker, who held a hearing on January 3, 2007. (Doc. No. 10-4: Response at Affidavit of Keith Parker, Exhibit A: Decision on Appeal). Mr. Parker upheld the classification of the Roe vs Wade Memorial as a demonstration and not a festival. He reasoned that January 22 was the anniversary of the Supreme Court's decision in Roe v. Wade and that the event would "primarily consist of individuals and groups taking turns speaking and singing regarding the subject of abortion." Id. Thus he concluded

> [t]he Roe vs. Wade Memorial would constitute a public demonstration or sentiment for or against a cause (*i.e.*, the subject of abortion) and is, therefore, a "demonstration" within the meaning of the Public Assembly Ordinance and a "picket" within the meaning of the Picket Ordinance.

---

[4] A demonstration is defined as "a public display of sentiment for or against a person or cause, including protesting." Charlotte City Code, Art. XI, § 19-311. The definition of public assembly for an event at Independence Square Plaza and other specified locations only includes festivals, but the definition of public assembly at non-enumerated places includes demonstrations. Id.

Id. He informed Rev. Benham that, subject to the regulations in the picketing ordinance, the event could be held at the time and place proposed without a permit. Id.

Rev. Benham did not seek judicial review of Mr. Parker's decision. Instead, the event was held on January 22, 2007, without incident. (Doc. No. 10-6: Response at Affidavit of Oliver Cunnigham). Sgt. Oliver Cunningham of the Charlotte-Mecklenburg Police Department observed the entire event and noted no one involved with the event was arrested or cited for any violation of law. Id. It appeared to Sgt. Cunningham that the event was conducted as planned, and there is no evidence in the record that any speech or expressive conduct was inhibited by the lack of a public assembly permit.

On September 20, 2007, the plaintiffs filed the instant complaint pursuant to 42 U.S.C. § 1983 alleging that the defendants impeded, and continue to impede, their free speech and free exercise rights guaranteed by the United States and North Carolina Constitutions.[5] (Doc. No. 1).

## II. DISCUSSION

### A. Preliminary Injunction Standard

In the instant motion, the plaintiffs seek a preliminary injunction against the defendants' enforcement of the City Code. "[A] preliminary injunction is an extraordinary remedy, to be granted only if the moving party clearly establishes entitlement to the relief sought." Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 811 (4th Cir. 1991). The Fourth Circuit has instructed district courts to consider four factors to determine whether to issue a preliminary injunction:

---

[5] Plaintiffs have not briefed how the North Carolina Constitution affects the instant Motions. Thus, the Court will consider that claim as abandoned for purposes of this Order. Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1325-26 (11th Cir. 2000).

> (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the requested relief is granted, (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest.

Newsom v. Albemarle County Sch. Bd., 354 F.3d 249, 254 (4th Cir. 2003) (quoting Direx, 952 F.2d at 812) (internal quotation marks omitted).

Here, the plaintiffs claim they are prohibited from exercising their First Amendment rights based on their fear of enforcement of Charlotte's public assembly ordinance. (Doc. No. 8: Motion at ¶ 1). Because the loss of First Amendment freedoms constitutes irreparable injury, Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality opinion), the Court's determination of irreparable harm requires analysis of the likelihood of success on the merits of the plaintiffs' constitutional challenge to the ordinance, Newsom, 354 F.3d at 254-55.

### B. Regulation of Traditional Public Forum

The parties agree that the plaintiffs' speech is protected by the First Amendment and the location at issue is a traditional public forum. The government may regulate speech in a public forum by imposing reasonable time, place, and manner restrictions that are justified without reference to the content of the speech, that are narrowly tailored to serve a significant government interest, and that leave open ample alternative channels for communication. Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989); Reyes v. City of Lynchburg, 300 F.3d 449, 454 (4th Cir. 2002).

#### 1. Content Neutral

The plaintiffs argue that Charlotte's regulations are content-based because the permit official must review the message to determine whether an event is a festival or a demonstration.

(Doc. No. 9: Memorandum at 7-10).  However, the Supreme Court has held that it is not improper to look at the content of communication to determine whether a rule of law applies to a course of conduct. Hill v. Colorado, 530 U.S. 703, 721-22 (2000); accord Mom N Pops, Inc. v. City of Charlotte, 979 F. Supp. 372, 387 (W.D.N.C. 1997) (city officials validly examined business to determine whether it was regulated by ordinance), aff'd, 162 F.3d 1155 (4th Cir. 1998) (unpublished).  Rather, the pertinent question is "whether the government has adopted a regulation of speech because of disagreement with the message it contains." Hill, 530 U.S. at 719 (internal citations and quotation marks omitted).

Considering the intent expressed in the preamble to the 2004 amendments, the Court concludes that Charlotte adopted the ordinance for content-neutral purposes, including protecting free speech, protecting public safety and order at public forums, and maintaining the free flow of pedestrian and vehicular traffic and access to public buildings.  These justifications are unrelated to the content of any regulated speech, Ward, 491 U.S. at 791-92, and there is no evidence at this point of unconstitutional motive by Charlotte, Giovani Carandola, Ltd. v. Bason, 303 F.3d 507, 515 (4th Cir. 2002).  By its own terms, the ordinance is intended to further legitimate government interests, such as management of city-controlled locations, without regard to the purpose or content of messages. (Doc. No. 10-5: Response at Affidavit of Brenda Freeze, Exhibit A: Ordinance No. 2621); Charlotte City Code, Art. XI, § 19-312(c) (prohibiting denial of permit based on content of views expressed).  The fact that the ordinance may have an incidental effect on some speakers or messages but not others does not make it content based. Ward, 491 U.S. at 791.  Accordingly, the plaintiffs have not shown a likelihood of success on the merits of this claim.

2. Narrowly Tailored

Even if a regulation is designed to serve content-neutral interests, the means for doing so may not be substantially broader than necessary to achieve those interests. Id. at 800. This requirement that a regulation be narrowly tailored does not mandate that the government employ the least restrictive means, but rather is satisfied if the "regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." Id. at 799. Thus, the government bears the burden to show that there is a reasonable fit between the regulation and its interests. Carandola, 303 F.3d at 515; Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta, (CAMP) 219 F.3d 1301, 1318 (11th Cir. 2000).

Here, Charlotte argues that the requirement that public assemblies receive permits is reasonable because of their impact on surrounding properties and demands for public service. (Doc. No. 10: Response at 13-14). The Supreme Court has recognized that a city, as trustee of the public, has the duty to keep their community's streets open and available for the movement of people and property. Schneider v. State of New Jersey, Town of Irvington, 308 U.S. 147, 160 (1939). However, a public assembly permit entitles its holders to exclude vehicular and pedestrian traffic that would normally have access to the public area. Charlotte City Code, Art. XI, § 19-312(d). Therefore, it is reasonable that Charlotte would need sufficient notice and opportunity to weigh and prepare for the impact of such a gathering. CAMP, 219 F.3d at 1317-18.

The plaintiffs assert that a closer nexus is required between the potential impact of speech and its regulation. (Doc. No. 9: Memorandum at 17). As an example of the alleged overly broad reach of the ordinance, they claim that the same permitting process applies whether two or two

thousand people wish to engage in speech. Id. at 17-18.  This example is flawed because any number of people may engage in speech without a permit in a public forum under the picketing ordinance. Charlotte City Code, Art. X, § 19-303.  This regulation also reasonably serves the government's interest to maintain public access and movement because demonstrations under the picketing ordinance may not obstruct others' use of the public space. Charlotte City Code, Art. X, § 19-303(c).  There is no evidence before the Court that a demonstration allowable under the picketing ordinance is insufficient to vindicate free speech rights, or that the benefits of a public assembly permit are necessary to protect free speech rights.  Thus, at this stage in the proceedings, the Court finds that the regulations do not burden substantially more speech than is necessary to further the government's legitimate interests. CAMP,  219 F.3d at 1319.

        3.        Alternative Channels of Communication

Regulation of speech in a public forum must "leave open ample alternative channels of communication." Ward, 491 U.S. at 802.  Such alternative channels may be less effective than a speaker would prefer. CAMP,  219 F.3d at 1319.  For example, in CAMP, the Eleventh Circuit rejected the plaintiffs' argument that access to municipal services provided with a festival permit, such as lighting, electricity, barricades, and stage covers, were essential to conveying their message.  Instead, the court recognized that the city's ordinance allowed the plaintiffs to gather in public to convey their message without a permit, and distinguished between convenient mechanisms of communication and the message itself. Id. at 1320.  Similarly in Ward, the Supreme Court found that no speech was banned simply because the city controlled the amplification system used for expressive activity at a band shell in a public park. Ward, 491 U.S. at 802.

Here, there is no evidence that the plaintiffs' speech has been or would be banned pursuant to the City Code. Charlotte officials notified the plaintiffs that the event as described in the 2006 application could be held without a permit, and it appears that it was. Plaintiffs have not yet shown the Court how their message was or would be restricted by the lack incidental benefits that accompany a public assembly permit. Accordingly, the Court finds that the plaintiffs have not established the likelihood of success on the merits of this claim.

    C.    Discretion of City Officials and Equal Protection

An otherwise valid content-neutral regulation is nevertheless unconstitutional if it vests unbridled discretion to those who enforce it because they have the power to suppress particular points of view. Thomas v. Chicago Park Dist., 534 U.S. 316, 323 (2002). Thus, a regulation must contain adequate standards to guide an official's decision and subject it to effective judicial review. Id.

Here, the plaintiffs complain that Charlotte has the discretion to classify events arbitrarily as either demonstrations or festivals and thereby to impose different standards on events based on the content of speech involved.[6] (Doc. No. 9: Memorandum at 12). They point to a number of events alleged to be similar that were granted permits. Id. at 14-16. Charlotte responds that the events were different from the Roe vs Wade Memorial; for example, all but one involved street closure. (Doc. No. 10: Response at 13). The record before the Court lacks meaningful detail about the events, so it is not possible to determine whether there has been a pattern of discriminatory enforcement of the ordinance.

---

[6] The plaintiffs do not allege that the grounds articulated in § 19-312(c) for denying a permit application are constitutionally deficient.

Considering the language of the public assembly ordinance, the Court notes there is potential overlap between the definitions of festival, which includes a promotion, and of demonstration, which includes a public display of sentiment for a cause. Charlotte City Code, Art. XI, § 19-311. However, given the context of the other types of events included as festivals, that definition is reasonably interpreted to apply to commercial or recreational activities, whereas the definition of demonstration is reasonably interpreted to apply to expressive speech. Charlotte persuasively argues that such a distinction is proper because the former is afforded less First Amendment protection, and thus must be approved in advance, while the latter is deserving of greater protection, and thus may be exercised without a permit under the picketing ordinance. (Doc. No. 10: Response at 10, 14).

Additionally, the Supreme Court has not required perfect clarity and precise guidance and has allowed city officials to apply statutory definitions that are subject to reasonable interpretation. Thomas, 534 U.S. at 324-25; Ward, 491 U.S. at 794. The definitions in the challenged ordinance contain standards to guide enforcement and prohibit discrimination. In fact, the Supreme Court used similar definitions for demonstrate and picket in its Hill decision.[7] 530 U.S. at 721-22. Accordingly, the Court finds that the plaintiffs have not demonstrated a likelihood of success on this claim.

D.  Likelihood of Harm to the Defendants and the Public Interest

Having considered the likelihood of harm to the plaintiffs by determining the likelihood of success on the merits of their claim, the Court must consider the harm to the defendants if an

---

[7]The Supreme Court utilized Webster's Third New International Dictionary to define "'demonstrate' as 'to make a public display of sentiment for or against a person or cause' and 'picket' as an effort 'to persuade or influence.'" Hill, 530 U.S. at 721-22.

11

injunction were issued and the public interest. Charlotte argues that the issuance of an injunction would chill legitimate law enforcement for fear of being taken to court by the plaintiffs for violating the injunction. (Doc. No. 10: Response at 9). Additionally, Charlotte claims that the public would be disrupted because the plaintiffs could choose to have a demonstration wherever and whenever they wish. Id.

The Court finds that Charlotte would be harmed if an injunction were issued. Not only would Charlotte be required to provide additional services with a public assembly permit, but other groups who seek permits to hold demonstrations in public forums would be allowed to do so. This circumstance particularly affects the public interest. Undoubtedly, the public interest favors upholding constitutional rights. Newsom, 354 F.3d at 261. The public interest also favors maintaining access to public spaces. Schneider, 308 U.S. at 160; CAMP, 219 F.3d at 1319. A public assembly permit would allow the plaintiffs to occupy public space in the center of the city in the middle of a work day and disrupt the public's access to that location. The status quo, however, allows the plaintiffs to communicate their message pursuant to the picketing ordinance in the same location at the same time without negative consequences to the public. Therefore, the potential harm to the defendants and the public interest weigh against issuing a preliminary injunction.

**IV.    CONCLUSION**

Based on the record before the Court, the plaintiffs have not demonstrated a likelihood of success on the merits of their claim of loss of First Amendment freedoms by operation of Charlotte's public assembly ordinance. Accordingly, the Court will not issue a preliminary injunction against enforcement of the ordinance or declare it unconstitutional pending further

development of the case. This Order is limited to resolving the instant motions and is not intended to forecast the Court's ultimate view of the merits of this case.

**IT IS, THEREFORE, ORDERED** that the Plaintiffs' Motion for Preliminary Injunction is **DENIED** and the Court's ruling on the Motion for Declaratory Judgment is held in abeyance.

Signed: January 17, 2008

Robert J. Conrad, Jr.
Chief United States District Judge