IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
No. 3:07cv395

| | |
|---|---|
| PHILIP BENHAM, et al., </br> Plaintiffs, </br> </br> vs. </br> </br> CITY OF CHARLOTTE, et al., </br> </br> Defendants. | ) </br> ) </br> ) </br> ) MEMORANDUM AND ORDER </br> ) </br> ) </br> ) </br> ) </br> ) |

**THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment (Doc. Nos. 22 & 24), Plaintiffs' Response (Doc. No. 25), and Defendants' Reply (Doc. No. 30). For the reasons stated below, the Court **GRANTS** Defendants' Motion for Summary Judgment.

I.  FACTUAL FINDINGS

This case involves the City of Charlotte's denial of a public assembly permit applied for by Rev. Philip Benham on behalf of Operation Save America, a non-profit corporation. In 2004, Charlotte amended portions of its Code dealing with picketing (Chapter 19, Article X) and public assemblies and parades (Chapter 19, Article XI). In doing so, Charlotte recognized its interest to protect the right of individuals to exercise First Amendment rights in traditional public forums, such as public sidewalks, streets, and parks. (Doc. No. 10-5: Response at Affidavit of Brenda Freeze, Exhibit A: Ordinance No. 2621). Charlotte further recognized its interest in "protecting the health, safety, and welfare of the general public and preserving public order" and in "maintaining the free flow of traffic on public streets and sidewalks, preserving access to public

1

places and buildings and protecting property." Id.  Charlotte's stated purpose in amending the

Code was to further its governmental interests by imposing

> . . . reasonable and constitutional regulations for the use of public streets, sidewalks, and parks during a picket, public assembly, or parade . . . without regard to the purpose or content of the message, but to preserve the public peace and to avoid unreasonable conflicts with other legitimate use of such property.

Id.

As amended, the Code requires a permit for any public assembly. Charlotte City Code, Art. XI, § 19-312(a).  A public assembly is defined as

> (1)   a festival or demonstration which is reasonably anticipated to obstruct the normal flow of traffic upon any public street and that is collected together in one place; and
> (2)   a festival on the Old City Hall lawn, the Charlotte-Mecklenburg Government Center Plaza, or in Marshall Park, Polk Park, Independence Square Plaza, Arequipa Park or any other city-controlled Park.

Charlotte City Code, Art. XI, § 19-311.  A festival "means a concert, fair, exhibit, promotion, community event, block party, or similar event." Id.  A permit may be denied based on reasons detailed in § 19-312(c).  If the permit official denies an application, that decision may be appealed to the appeals official, who must hold a hearing. Charlotte City Code, Art. XI, § 19-312(f).  If the denial is upheld, the applicant may appeal to the Superior Court of Mecklenburg County. Id.

The Code does not require a permit for a picket, which is defined as

> . . . a public display or demonstration of sentiment for or against a person or cause, including protesting which may include the distribution of leaflets or handbills, the display of signs and any oral communication or speech, which may involve an effort to persuade or influence, including all expressive and symbolic conduct, whether active or passive.

Charlotte City Code, Art. X, § 19-301. Picketing is allowed on public sidewalks and at city-controlled locations, such as Independence Square Plaza. Charlotte City Code, Art. X, § 19-303. Picketers may not obstruct pedestrian or vehicular traffic and must comply with other city ordinances, such as the noise ordinance. Id.

On December 14, 2006, Sheryl Chandler submitted a public assembly application on behalf of Rev. Benham and Operation Save America. The application described the proposed event's name as "Roe vs Wade Memorial" to be held on January 22, 2007, between 11:30 a.m. and 1 p.m., at "Trade and Tryon–in front of the bronze disc sculpture."[1] (Doc. No. 26: Pl. Ex. 13). The application stated that the event would not involve the closure of streets, the sale of alcoholic beverages or food, the provision of portable toilets, or the charging of admission and vendor fees. Id. The event was described as "evangelical, gospel proclamation, praise + worship band, local Christian pastors speaking, post-abortive mothers give testimony, call to repentance" with one stage for musical entertainment. Id. Based on previous years' attendance,[2] it was estimated that 100 people would attend. Id.

On December 20, 2006, Permit Official Emily Westbrook notified Rev. Benham by letter that she could not accept and process his application. (Doc. No. 26: Pl. Ex. 14). She explained that the event was a demonstration and not a festival according to the City Code and that permits

---

[1] The Court takes judicial notice that January 22, 2007, was a Monday. The area described in the application is known as Independence Square Plaza and sits at the very center of uptown Charlotte.

[2] Although the application implies that the event had been held previously, none of the plaintiffs had applied for a permit before 2006. (Doc. No. 10: Response at Affidavit of Emily Westbrook, ¶ 7).

3

for demonstrations at Independence Square Plaza are not issued.[3] Id. Instead, demonstrations at that location are covered by the picketing ordinance which does not require a permit. Id. Ms. Westbrook informed Rev. Benham that he was required to notify the police department if he expected 50 or more attendees and to obtain an amplified sound permit if he used amplification. Id.

On December 28, 2006, Rev. Benham appealed Ms. Westbrook's decision to Appeals Official Keith Parker, who held a hearing on January 3, 2007. (Doc. No. 26: Pl. Ex. 15). Mr. Parker upheld the classification of the Roe vs Wade Memorial as a demonstration and not a festival. He reasoned that January 22 was the anniversary of the Supreme Court's decision in Roe v. Wade[4] and that the event would "primarily consist of individuals and groups taking turns speaking and singing regarding the subject of abortion." Id. Thus he concluded:

> [t]he Roe vs. Wade Memorial would constitute a public demonstration or sentiment for or against a cause (i.e., the subject of abortion) and is, therefore, a "demonstration" within the meaning of the Public Assembly Ordinance and a "picket" within the meaning of the Picket Ordinance.

Id. He informed Rev. Benham that, subject to the regulations in the picketing ordinance, the event could be held at the time and place proposed without a permit. Id.

Rev. Benham did not seek judicial review of Mr. Parker's decision. Instead, the event was held on January 22, 2007, without a permit. Sgt. Oliver Cunningham of the Charlotte-

---

[3] A demonstration is defined as "a public display of sentiment for or against a person or cause, including protesting." Charlotte City Code, Art. XI, § 19-311. The definition of public assembly for an event at Independence Square Plaza and other specified locations only includes festivals, but the definition of public assembly at non-enumerated places includes demonstrations. Id.

[4] 410 U.S. 113 (1973).

Mecklenburg Police Department observed the entire event and noted no one involved with the event was arrested or cited for any violation of law, although two noise ordinance warnings were issued. (Doc. No. 25: Pl. Ex. 11: Oliver Dep. at 18, 21). It appeared to Sgt. Cunningham that the event was conducted as planned, (Doc. No. 10-6: Response at Affidavit of Oliver Cunnigham), and there is no evidence in the record that any speech or expressive conduct was inhibited by the lack of a public assembly permit.

On September 20, 2007, Plaintiffs filed the instant complaint pursuant to 42 U.S.C. § 1983 alleging that Defendants impeded, and continue to impede, their free speech and free exercise rights guaranteed by the United States and North Carolina Constitutions.[5] (Doc. No. 1).

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment may be granted in a First Amendment case. Steinburg v. Chesterfield County Planning Comm'n, 527 F.3d 377 (4th Cir. 2008) (affirming district court's grant of summary judgment on free speech claim). Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

---

[5] Plaintiffs have not briefed how the North Carolina Constitution affects the instant Motion. Thus, the Court will consider that claim as abandoned for purposes of this Order. Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1325-26 (11th Cir. 2000).

together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. Evidence that is not supported is insufficient to defeat a motion for summary judgment. Id. at 323-24. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995). When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. However, "a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

Plaintiffs' summary judgment response includes a section titled "Statement of Disputed Facts," (Doc. No. 25: Mem. at 3-21), which details Ms. Westbrook's and Mr. Parker's interpretation of the ordinance and contains facts about other events that were granted permits. Plaintiffs take issue with Charlotte's classification of the Roe vs Wade Memorial as a demonstration and other events as festivals. They point out characteristics of other events which should, in their opinion, have resulted in a demonstration classification for them as well. Defendants point out differences between the other events and the Roe vs Wade Memorial in

6

defense of Charlotte's classification and permit-issuing decisions. Thus, it appears that the evidence in the case is not contested, but rather the parties dispute the legal conclusions resulting from the facts in the record, making the issues ripe for summary judgment.

Defendants have moved for summary judgment on all claims. (Doc. No. 22: Motion at ¶ 3). Plaintiffs' response only addresses the facial and as-applied challenges to Charlotte's ordinances based on the First Amendment to the United States Constitution and challenges under the federal Equal Protection and Due Process Clauses. (Doc. No. 25: Memorandum at 1-2, 22). Accordingly, all other claims are considered abandoned by Plaintiffs. Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta (CAMP), 219 F.3d 1301, 1325-26 (11th Cir. 2000).

B.      Free Speech Challenge to Ordinance

The parties agree that Plaintiffs' speech is protected by the First Amendment and the location at issue is a traditional public forum. The government may regulate speech in a public forum by imposing reasonable time, place, and manner restrictions that are justified without reference to the content of the speech, that are narrowly tailored to serve a significant government interest, and that leave open ample alternative channels for communication. Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989); Reyes v. City of Lynchburg, 300 F.3d 449, 454 (4th Cir. 2002). When a permit is required before engaging in speech, such prior restraint on speech must "contain narrow, objective, and definite standards to guide the licensing authority." Green v. City of Raleigh, 523 F.3d 293, 300 (4th Cir. 2008) (quoting Forsyth County v. Nationalist Movement, 505 U.S. 123, 131 (1992)) (internal quotation marks omitted).

Here, Charlotte has two provisions that regulate speech activities in public forums. First, the public assembly ordinance allows festivals and demonstrations anticipated to obstruct traffic

and festivals at certain parks to be held upon issuance of a permit. Charlotte City Code, Article XI, §§ 19-311, et seq. Second, the picketing ordinance allows expressive conduct on public property without prior approval. Id., Article X, §§ 19-301, et seq. Defendants Westbrook and Parker were not responsible for the enactment of either provision; therefore, claims against them relating to the facial challenge must be dismissed. Defendants argue that the picketing and public assembly ordinances work in tandem to provide a constitutionally sufficient alternative channel for communication where a public assembly permit is not issued.

       1.     Content Neutral

Plaintiffs acknowledge, (Doc. No. 25: Mem. at 22), the Court's ruling at the preliminary injunction stage, (Doc. No. 15: Order at 6-7), that the 2004 amendments to the Code are content neutral. That decision was based on a finding that they were adopted for content-neutral purposes, including protecting free speech, protecting public safety and order at public forums, and maintaining the free flow of pedestrian and vehicular traffic and access to public buildings, that are unrelated to the content of any regulated speech. Id. Additionally, the Court found that it was permissible for City officials to consider the content of communication for the limited purpose of determining which ordinance applies. Id.

At the summary judgment stage, Plaintiffs have not shown any evidence of unconstitutional motive by Charlotte in enacting the picketing and public assembly ordinances. Their as-applied argument that the public assembly ordinance was used by City officials to discriminate against Plaintiffs' speech will be addressed below.

2.  Narrowly Tailored

The Court previously determined that the public assembly ordinance was narrowly tailored, that is, there is a reasonable fit between the regulation and Charlotte's interests. (Doc. No. 15: Order at 8-9).  Additionally, the Fourth Circuit has found a picketing ordinance substantially similar to Charlotte's to be narrowly tailored. Green, 523 F.3d at 302-05.  Following discovery, Plaintiffs have not shown that the ordinance reaches substantially more conduct than necessary to protect Charlotte's interests.

The restriction against picketing at a location already reserved for a festival does not, on its face, unconstitutionally prefer some speech over others or act to exclude completely speech activities that do not receive a permit.  Such a restriction is narrowly tailored to the significant interest of Charlotte to preserve the public peace and to avoid unreasonable conflicts with other legitimate uses of city-controlled property.[6]  Nothing in the ordinance precludes picketing on near-by public property during a festival; therefore, it leaves open ample alternatives for communication.

3.  Alternative Channels of Communication

Charlotte relies on the picketing ordinance as an alternative channel of communication for demonstrations that do not qualify as public assemblies under the ordinance. (Doc. No. 24: Mem. at 13).  Plaintiffs' response presumes that a public assembly permit is necessary to vindicate their free speech rights, as they complain that the picketing ordinance contains "additional discretionary restrictions" not found in the public assembly ordinance. (Doc. No. 25:

---

[6] Further, there is no live case or controversy on this issue because Plaintiffs held their Roe vs Wade Memorial at their desired location without interference by a group already granted a festival permit.

9

Mem. at 23). Plaintiffs also allege that Charlotte "may entirely deny all of Plaintiff's speech" because picketing is not allowed at a location for which a public assembly permit has been issued or is otherwise reserved for private use. Id.

Regulation of speech in a public forum must "leave open ample alternative channels of communication." Ward, 491 U.S. at 802. Such alternative channels may be less effective than a speaker would prefer. CAMP, 219 F.3d at 1319. For example, in CAMP, the Eleventh Circuit rejected the plaintiffs' argument that access to municipal services provided with a festival permit, such as lighting, electricity, barricades, and stage covers, were essential to conveying their message. Instead, the court recognized that the city's ordinance allowed the plaintiffs to gather in public to convey their message without a permit, and distinguished between convenient mechanisms of communication and the message itself. Id. at 1320. Similarly in Ward, the Supreme Court found that no speech was banned simply because the city controlled the amplification system used for expressive activity at a band shell in a public park. Ward, 491 U.S. at 802. Plaintiffs were not denied getting their message out; they were simply unable to get their message out in the manner they most desired with a louder decibel limit. Thus, similar to the plaintiffs in Ward and CAMP, Plaintiffs' presumption that decibel benefits associated with public assembly permits are constitutionally required to vindicate free speech rights is not warranted. Plaintiffs' assertion is unconvincing, especially considering the picketing ordinance grants alternative channels of communication. There is no evidence before the Court that a demonstration allowable under the picketing ordinance is insufficient to vindicate free speech rights.

Contrary to Plaintiffs' characterization of the picketing ordinance, there are no provisions in it that call on the exercise of discretion by city officials. The "additional restrictions" such as advance notice and sign size do not impermissibly burden speech because they do not in any serious way prohibit groups from disseminating their message. Green, 523 F.3d at 305-06. Although Rev. Benham complained in the appeals hearing about the decibel limit under the noise ordinance, Plaintiffs have not shown that a certain decibel limit is constitutionally required. In fact, as noted above, the Supreme Court has held to the contrary, finding that volume control did not amount to banning protected speech. Ward, 491 U.S. at 802.

4. Discretion of City Officials

An otherwise valid content-neutral regulation is nevertheless unconstitutional if it vests unbridled discretion to those who enforce it because they have the power to suppress particular points of view. Thomas v. Chicago Park Dist., 534 U.S. 316, 323 (2002). Thus, a regulation must contain adequate standards to guide an official's decision and subject it to effective judicial review. Id.; Green, 523 F.3d at 300. Here, Plaintiffs complain that the ordinance gives City officials the discretion to classify events arbitrarily as either demonstrations or festivals and to thereby impose different standards on events based on the content of speech involved. (Doc. No. 25: Mem. at 23).

The Court previously noted the potential overlap between the definitions of festival, which includes a promotion, and of demonstration, which includes a public display of sentiment for a cause found in § 19-311. (Doc. No. 15: Order at 11). Considering the context of the words, where "festival" is reasonably interpreted to apply to commercial or recreational speech, and "demonstration" is reasonably interpreted to apply to expressive speech, the Court found that the

11

definitions in the challenged ordinance contain standards to guide enforcement and prohibit discrimination. Id.

In order to emphasize the city officials' discretion, Plaintiffs assert that Defendants disagreed over whether demonstration permits are ever granted under the ordinance.[7] However, asserting that Charlotte never issued a permit for a demonstration does not mean that the city does not recognize demonstrations. Instead, demonstrations that do not close the streets are done without a permit during the week, or with a demonstration permit which closes the streets during the weekend. Additionally, Plaintiffs' assertion is without merit because Charlotte granted a demonstration permit to the Mec Dec Celebrations and the Obama campaign, which closed streets over the weekend, and fits the designation of a demonstration, rather than a festival. (Oral Arguments Transcripts at 28).

    C.    As-Applied Challenge, Equal Protection, and Due Process

Instead, Plaintiffs argue that Ms. Westbrook and Mr. Parker discriminated against them by classifying the Roe vs Wade memorial as a demonstration, not a festival. (Doc. No. 25: Mem. at 22-23). They offer no direct evidence of intentional discrimination, but rather allege a pattern of discriminatory enforcement of the ordinance based on evidence of other events that received public assembly permits. (Doc. No. 25: Mem. at 3-21). Although the response does not lay out the legal framework for equal protection and due process claims, Plaintiffs assert that their

---

[7]Plaintiffs assert Ms. Westbrook's letter denying Plaintiffs' permit states that the public assembly ordinance does not ever allow her to grant demonstration permits, whereas Mr. Parker and Mr. Richardson both testified that they believe the ordinance does allow demonstration permits to be granted. (Doc. No. 25 at 6). However, the Court finds this inconsequential because as detailed later, Charlotte in fact granted demonstration permits for or against a person or cause under the public assembly ordinance, and in the alternative, parties conducted their demonstrations under the picketing ordinance without a permit.

speech was unfairly burdened with additional restrictions and was subject to complete exclusion in favor of a festival. (Id. at 22-23). Defendants reply that the event was properly considered to be a demonstration and that other events were properly considered festivals. (Doc. No. 30: Reply at 2-11).

"The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." Willis v. Town of Marshall, N.C., 426 F.3d 251, 263 (4th Cir. 2005) (quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)) (internal quotation marks omitted). Thus, Plaintiffs can establish an equal protection claim by showing that they were "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Id. In determining whether Plaintiffs' event was discriminated against, it is necessary to consider whether events treated differently were "in all relevant respects alike." Vemey v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)) (internal quotation marks omitted). Plaintiffs' due process claims mirror their equal protection claims and can be resolved together. Willis, 426 F.3d at 266. Plaintiffs proffered the following events to demonstrate examples of the alleged disparaging treatment between Plaintiffs' failure to receive a permit and other similarly situated permit applicants.

      1.    Roe vs Wade Memorial

As detailed above, Plaintiffs sought to hold their event at Independence Square Plaza, on a business day, at lunch hour. (Doc. No. 26: Pl. Ex. 13). The event did not require the closing of

any street, and was to include "evangelical, gospel proclamation, praise + worship band, local Christian pastors speaking, post-abortive mothers give testimony, call to repentance" with one stage for musical entertainment. Id. At the appeals hearing, Rev. Benham stated that the Roe vs Wade Memorial would be a community event, like a funeral, with similar events across the nation on the anniversary of the Supreme Court's decision. (Doc. No. 23: Def. Ex. 4: Hearing Tr. at 14, 24-25).

2. Torch Rally

Ms. Westbrook testified that a group sought a public assembly permit for Independence Square for a Saturday, mid-day event. (Doc. No. 23: Def. Ex. 5: Westbrook Aff. at ¶ 9). The event did not require the closing of a street, and its purpose was to light a torch in relation to human rights issues in Sudan. Id. Ms. Westbrook denied a public assembly permit on the basis that it was a demonstration.

This event is similar to the Roe vs Wade Memorial based on its location and non-commercial purpose. Plaintiffs argument that they were treated unequally, compared to the Torch Rally, is unconvincing because both events were denied demonstration permits. Instead, it shows that Plaintiffs' event was treated equally, compared to another similar event.

3. Mec Dec Celebrations

For many years, on May 20, or the closest weekday thereto, the May 20th Society has held a celebration in honor of the signing of the Mecklenburg Declaration of Independence at Independence Square Plaza, the location of the Charlotte's original courthouse. (Doc. No. 25: Pl. Ex. 6: Krumbine Dep. at 10, 15). The one-hour lunchtime event involves re-enactments, a fife and drum band, and the firing of a canon. In 2006, the event was considered a demonstration and

14

did not receive a public assembly permit. (Doc. No. 23: Def. Ex. 5: Westbrook Aff. at ¶ 8). In 2007, it was held with a permit. (Doc. No. 25: Pl. Ex. 6: Krumbine Dep at 16-17). In 2008, Ms. Westbrook considered the event a demonstration, and the application for a public assembly permit was withdrawn when the organizers realized closing a street was not necessary. (Doc. No. 23: Def. Ex. 5: Westbrook Aff. at ¶ 10; Doc. No. 25: Pl. Ex. 6: Krumbine Dep. at 8).

Plaintiffs argue that the issuance of a permit for this event in 2007 shows that the Roe vs Wade Memorial was treated differently. Both events were conducted on a workday, at lunchtime, at Independence Square. However, Ms. Westbrook testified that in 2007, the group sought street closures for the celebration which involved food and beverage vendors. (Doc. No. 25: Pl. Ex. 2: Westbrook Dep. at 24, Apr. 30, 2008). Accordingly, it was not similar in all relevant respects to Plaintiffs' event, which did not include street closure or vendors. The fact that the event was held two other years without a permit supports Defendants' argument that speech can sufficiently occur at Independence Square Plaza without a public assembly permit.

4. Red Cross 90th Anniversary

The Red Cross was issued a public assembly permit that enabled it to close streets from the intersection of Trade and Tryon (the Square) to 5th Street on a workday between 11 a.m. to 3 p.m. (Doc. No. 26: Pl. Ex. 17). The purpose of the event was "to promote the 90th anniversary of the Red Cross and to generate publicity to further the mission of connecting stronger to the community." (Doc. No. 26: Pl. Ex. 16). Streets were closed to display emergency response vehicles. (Doc. No. 25: Pl. Ex. 6: Krumbine Dep. at 28).

This event is not similar to the Roe vs Wade Memorial because it did not involve Independence Square Plaza, required street closure, and was in the nature of commercial speech,

15

that is, promoting the Red Cross as an organization. Therefore, the Roe vs Wade Memorial and the Red Cross' 90th Anniversary do not share sufficient similarities to demonstrate inequitable treatment of Plaintiffs' permit request.

5. Charlotte Criterium

Similarly, the Charlotte Criterium received a public assembly permit to close several streets in uptown Charlotte for the purpose of holding a professional cycling race to raise money for the Brain Tumor Fund for the Carolinas. (Doc. No. 26: Pl. Ex's. 18, 19). Charlotte Criterium was held on the weekend and closed several streets, which are only two of several characteristics which differentiate it from Plaintiffs' event.

6. Outreach and Evangelism Explosion

This event involved a street closure away from the center of Charlotte on a weekend to protect pedestrians attending a cookout, concert, and distribution of goods at a church. (Doc. No. 26: Pl. Ex's. 20, 21). The only characteristic similar to the Roe vs Wade Memorial was evangelical proclamation, but even that occurred on private property, not a city-controlled park. There are sufficient differences between Outreach and Evangelism Explosion's event, which was held on a weekend, with a closed street, and away from the center of Charlotte, and the Roe vs Wade Memorial. Plaintiffs were not treated despairingly compared to this event because these events share few similarities.

7. United Family Services Victim Assistance & Rape Crisis Survivors Fest

This event received a public assembly permit to close a portion of a street away from the center of the city on a weekend. (Doc. No. 26: Pl. Ex's. 20, 21). The characteristic that this event shares with the Roe vs Wade Memorial is that bands were scheduled to play and people were

16

expected to speak with the benefit of amplified sound. In other respects, such as location, day of the week, and impact on commercial activity, it was not similar. Plaintiffs' argument that this event demonstrates mistreatment of the Plaintiffs' permit request is without merit.

        8.      Pride Charlotte

Plaintiffs emphatically point to Pride Charlotte events held in 2006–2008 as evidence of viewpoint discrimination. The 2006 event was held at Marshall Park, which is a city-controlled park like Independence Square. (Doc. No. 27: Pl. Ex. 29). Unlike Independence Square, Marshall Park is located away from the center of the city. The 2007 and 2008 events involved the closing of a street away from the center of the city. (Doc. No. 27: Pl. Ex. 24). An important distinction between the Pride Charlotte events and the Roe vs Wade Memorial is that they all occurred on the weekend. Although expressive activity, such as political campaigning and advocacy for gay and lesbian issues, took place, there were also commercial activities, such as selling food, alcohol, and t-shirts. (Doc. No. 25: Pl. Ex. 10: Hall Dep. at 18). Accordingly, they were not similar to Plaintiffs' event in all relevant respects.

In light most favorable to Plaintiffs, the evidence they offered of other events that received public permits fails to establish discrimination in Defendants' classification of the Roe vs Wade Memorial as a demonstration. In fact, the events closest in similarity to Plaintiffs', the Torch Rally and the Mec Dec Celebrations in 2006 and 2008, likewise did not receive permits. Thus, Plaintiffs have not provided evidence that Charlotte sought to suppress their speech or that any other similarly situated event was classified more favorably.

Plaintiffs' complaint that those with public assembly permit are not subject to same rules as those without does not establish unlawful discrimination. The Court has previously found that

Charlotte has shown content-neutral justifications for its ordinances regarding festivals and demonstrations. (Doc. No. 15: Order at 6-7). The alternative channel of communication under the picketing ordinance allowed Plaintiffs to disseminate their message without impermissible burden. They have not shown that the Code's restriction on picketing at locations occupied by a public assembly with a permit had any effect on the Roe vs Wade Memorial. Accordingly, Plaintiffs' as-applied, equal protection, and due process challenges fail.

III. CONCLUSION

Based on the record before the Court, Plaintiffs have not put forth sufficient evidence to allow a tier of fact to return verdict in their favor. The Court finds that there is no genuine issue as to any material fact and that Defendants are entitled to a judgment as a matter of law.

**IT IS, THEREFORE, ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED** and this case is dismissed in its entirety.

Signed: January 7, 2010

Robert J. Conrad, Jr.
Chief United States District Judge